IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Civil Action No. 3:15-CV-01712-N |
| CENTEX CORPORATION, | | |
| Defendant. | | |

## **ORDER**

This Order addresses Plaintiff Zurich American Insurance Company's ("Zurich") motion for summary judgment [13], Defendant Centex Corporation's ("Centex") motion for summary judgment [16], and Zurich's motion for leave to file a surreply [25]. Because Centex breached its insurance policy with Zurich, the Court grants summary judgment for Zurich.

### I. THE ORIGINS OF THE DISPUTE

This case arises from Centex's settlement of a lawsuit concerning the defective construction of a residential complex called the Element Project.[1] Centex subsidiaries Centex Homes and Centex Real Estate Corporation were the developers of the Element

---

[1]Zurich and Centex do not dispute these facts. All references are to the Appendix in Support of Zurich American Insurance Company's Motion for Summary Judgment [15] ("Zurich App.") and the Appendix in Support of Centex Corporation's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment [18] ("Centex App.").

ORDER – PAGE 1

Project, and Centex subsidiaries Centex Construction Company, Inc. and Centex Construction Inc. n/k/a Balfour Beatty Construction Company, Inc. were its general contractors (collectively, the "Centex Subsidiaries"). Centex App. 003. In the underlying lawsuit (the "Element Litigation"), the Element Owner's Association ("EOA") sued the Centex Subsidiaries in California state court for defective construction of the Element Project. *Id.* at 004. After the Centex Subsidiaries removed the case to federal court, EOA named several local subcontractors as defendants and secured a remand. *Id.* at 950–51.

The Element Litigation implicated three insurance policies held by Centex and its subsidiaries. First, the Lexington Insurance Company ("Lexington") issued a wrap-up policy (the "Lexington Wrap Policy") to Centex Homes providing coverage for the Element Project. *Id.* at 602. The Lexington Wrap Policy has a self-insured retention ("SIR") amount of $500,000 and a $5 million limit of liability for each occurrence. Zurich App. 00003; Centex App. 602. The Insurance Company of the State of Pennsylvania ("ISOP") also issued a wrap-up policy to Centex Homes (the "ISOP Wrap Policy"). Centex App. 639. The ISOP Wrap Policy is excess to the Lexington Wrap Policy and has a $5 million limit of liability. Zurich App. 00040; Centex App. 639. Finally, Zurich issued a commercial general liability policy (the "Zurich Policy") to Centex providing coverage excess to the Lexington Wrap Policy and the ISOP Wrap Policy. Centex App. 678. The Zurich Policy's limit of liability is $6 million per occurrence, and it has a $1 million deductible. *Id.* at 678, 734.

Centex, Centex Homes, Lexington, ISOP, and Zurich each contributed substantial sums to the Element Litigation. First, upon receiving EOA's pre-suit notice of claim, Centex

Homes attempted to repair the Element Project. Centex claims the pre-suit repairs totaled $97,787.01. *Id.* at 004, 774. After EOA filed its lawsuit against the Centex Subsidiaries, Centex undertook initial responsibility for their defense, incurring $485,112.09 in defense costs. *Id.* at 836–39. Later, Lexington assumed responsibility for the defense, paying an additional $1,086,881. *Id.* at 005, 920–23.

On the eve of trial, EOA executed two settlements with the defendants and their insurers. In the first settlement, "[EOA]/Subcontractor Settlement Agreement," Lexington and ISOP pledged the remaining proceeds of their wrap policies for a release of all claims against the subcontractors. *Id.* at 795, 798–99. Centex represents that Lexington and ISOP ultimately paid $8,982,378 under this agreement. *Id.* at 005, 920–23. In the second settlement, "[EOA]/Centex Settlement Agreement," Zurich secured a release of all claims against the Centex Subsidiaries in exchange for a supplemental payment not to exceed $3.1 million, yielding a total settlement value of $11.5 million. *Id.* at 820–22. After a final accounting, Zurich paid $2,517,621.71 under this agreement. *Id.* at 005, 834–35.

The instant dispute concerns the deductible requirement of the Zurich Policy. Zurich argues that, having footed the bill for Centex's defense beyond the $10.5 million level, Centex now must reimburse it $1 million. Centex disputes this reading of the policy and argues that payments made by itself, Centex Homes, Lexington, and ISOP over the course of the Element Litigation satisfied the deductible requirement. To date, Centex has made two payments to Zurich totaling $172.57. Zurich Br. in Supp. of Mot. for Summ. J. 5 [14]. Zurich filed suit against Centex to recover the remainder of the $1 million deductible,

asserting breach of contract. The parties filed cross-motions for summary judgment in support of their respective positions.

## II. THE COURT GRANTS ZURICH LEAVE TO FILE A SURREPLY

After the parties completed briefing on their cross-motions for summary judgment, Zurich moved for leave to file a surreply. Local Civil Rule 56.7 provides that "a party may not, without the permission of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence" in support of or in response to a motion for summary judgment. "Leave to file a surreply is unwarranted . . . where the proposed surreply merely restates the arguments made in the party's initial response." *Lombardi v. Bank of America*, 2014 WL 988541, at *3 (N.D. Tex. 2014) (O'Connor, J.) (citing *Williams v. Aviall Serv. Inc.*, 76 Fed. App'x 534, 535 (5th Cir. 2003). However, when a movant raises new legal theories or evidence for the first time in its reply, the court may grant leave to file a surreply in order to afford the nonmovant an opportunity to respond. *Id.*

Zurich's proposed surreply makes three claims: (1) that allowing Centex to credit payments from other entities towards the deductible would expand the Zurich Policy's liability limit; (2) that any claimed attorney's fees must be reasonable; and (3) that the deductible does not apply to defense costs or attorney's fees of any kind. The first two claims merely rehash arguments that Zurich made in its Motion for Summary Judgment and Reply/Response to Centex's Cross-Motion for Summary Judgment. The third claim, however, asserts a new argument. Notably, Zurich bases this claim on a contractual provision in the Zurich Policy regarding allocated loss adjustment expenses ("ALAE") – the

same provision Centex cites for the very first time in its Reply in support of its argument that defense costs should count towards the deductible. Because Centex asserted a new legal theory based on the ALAE provision in its Reply, the Court will afford Zurich an opportunity to respond. Accordingly, the Court grants Zurich's motion for leave to file a surreply.

### III. THE COURT GRANTS SUMMARY JUDGMENT TO ZURICH

The Court now turns to the cross-motions for summary judgment. A breach of contract claim requires proof of: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 396 (Tex. App. – El Paso 1998, pet. denied). Zurich asserts that no genuine issue of material fact exists with respect to these four elements, and that it is entitled to judgment as a matter of law. Centex argues that Zurich has not proven a breach of the Zurich Policy or any resulting damages. Because the undisputed facts show that Centex has not satisfied its $1 million deductible, the Court finds that Centex breached its agreement with Zurich, and that Zurich suffered $999,827.43 in damages as a result.

#### A. The Summary Judgment Standard

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### B. Interpretation of Insurance Policies Under Texas Law

The parties agree that Texas law applies to this breach of contract claim. Under Texas law, the interpretation of an insurance policy is a question of law. *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 858 (5th Cir. 2014); *see also Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983). Courts construe an insurance policy according to ordinary contract principles. *Doubletree*, 739 F.3d at 858 (citing *Forbeau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker*, 650 S.W.2d at 393. Courts should read the contract "as a whole" and endeavor to give each part of the contract effect. *Forbeau*, 876 S.W.2d at 133.

"Whether a contract is ambiguous is also a question of law." *Doubletree*, 739 F.3d at 858. "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). If more than one reasonable interpretation exists, courts "resolve the uncertainty by adopting the construction that most favors the insured." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

### C. Centex Has Not Satisfied the Zurich Policy's $1 Million Deductible

The Zurich Policy is subject to a deductible of $1 million. The Deductible Endorsement portion of the Zurich Policy describes the deductible requirement. It states: "You will reimburse us for the deductible amounts that we pay on your behalf." Centex App. 734. The "Rights and Duties" section of the Deductible Endorsement explains that "[t]he

first Named Insured shown in the declarations is authorized to and shall reimburse us for all amounts paid by us on behalf of all Named Insureds." *Id.* at 736. The "Rights and Duties" section further provides that "[y]ou must promptly pay us for all amounts for which you are responsible under this endorsement and promptly reimburse us for any such amounts that we pay upon receipt of a billing from us." *Id.*

This case is much simpler than those cited by the parties. It involves a single policy year and a single tower of coverage with a single carrier at every layer. As illustrated in the diagram below, Zurich's liability is not triggered until $10.5 million is paid, with its deductible kicking in from $10.5 million to $11.5 million:



The fact that Centex or Lexington or ISOP may have made payments of amounts below $10.5 million is of no importance. Centex's deductible under the Zurich policy does not *start* until $10.5 million, and continues up to $11.5 million. The parties' cases involving multiple carriers at a particular layer or multiple years of policies do not alter this simple fact: Zurich is entitled to reimbursement from Centex of amounts Zurich paid between $10.5 million and $11.5 million. *See Fed. Ins. Co. v. Srivastava*, 2 F.3d 98 (5th Cir. 1993) (holding excess carrier's obligations do not begin until underlying policy limits are paid, notwithstanding insolvency of a layer or purported satisfaction of a layer by settlement for a lesser amount).

Centex asserts that payments made by itself, Centex Homes, Lexington, and ISOP have satisfied the Zurich Policy's deductible requirement. In particular, Centex argues that Texas law permits other entities to satisfy a deductible on the insured's behalf, even where the language of the policy appears to require payment by the insured itself. Centex's principal source of authority is *Continental Casualty Co. v. North American Capacity Insurance Co.*, 683 F.3d 79 (5th Cir. 2012).

In *Continental Casualty*, the insured held two insurance policies providing primary coverage and two policies providing excess coverage. 683 F.3d at 82. One primary insurer agreed to defend the insured in an underlying lawsuit; the other primary insurer refused, stating that the insured had failed to meet the policy's $250,000 SIR. *Id.* at 83. The Fifth Circuit held that payments made by the first primary insurer and by one of the excess insurers on the insured's behalf had satisfied the SIR. The court noted that "the policy does not explicitly require the insured to pay the amount itself." *Id.* at 90. The court also explained

ORDER – PAGE 9

that the SIR "'represents the amount of the loss that the insured is responsible for before the coverage is triggered.'" *Id.* (quoting disputed policy). As a result, the policy permitted other entities to satisfy the deductible on the insured's behalf. Because the primary insurer and the excess insurer had spent millions of dollars on the insured's defense, the court found that the $500,000 SIR had been fulfilled and that the other primary insurer had a duty to defend.

Before getting to the parties' legal arguments, the Court notes that *Continental Casualty* is factually distinguishable from this case. Zurich probably does not care *who* pays its deductible, it just wants somebody to pay it. If Lexington or ISOP had paid the amounts between $10.5 million and $11.5 million, there might be no lawsuit. If Centex had separately insured its deductible with another carrier, there definitely would be no lawsuit. Zurich's problem here is that *nobody* has paid the deductible. Zurich is therefore entitled under its policy to look to its insured, Centex, for reimbursement of amounts Zurich paid between $10.5 million and $11.5 million.

Zurich contends that *Continental Casualty* is not applicable to this case because it concerned a SIR requirement and not a deductible. The deductible here is distinguishable from the SIR in *Continental Casualty* in one crucial respect. With an SIR, the insured must meet the SIR amount before the insurer becomes responsible for any payment under the policy. *See Cont'l Cas.*, 683 F.3d at 90 (citing 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 11.31 (5th ed.)). For example, the disputed policy in *Continental Casualty* provided that the SIR "'must be paid prior to any payment being made by [the insurer] under the terms and conditions of this Policy of insurance.'" 683 F.3d at 90 (quoting disputed

ORDER – PAGE 10

policy). Accordingly, the insurer's liability attached only after the insured covered its portion of the loss.

But the Zurich Policy requires Centex to *reimburse* the deductible to Zurich. The Fifth Circuit has noted that "reimbursement requires one to put forth something in order to be paid back." *TIG Ins. Co. v. Eagle Inc.*, 294 Fed. App'x 920, 923 (5th Cir. 2008) (internal quotation marks and citation omitted). The language of the Deductible Endorsement comports with this definition of "reimbursement." It specifically requires Centex to reimburse Zurich "for deductible amounts that [Zurich] pay[s] on [Centex's] behalf." Centex App. 734. In other words, the policy requires Centex to pay back deductible amounts that Zurich puts forth, obliging Centex to meet the reimbursable requirement after Zurich covers the deductible amount, not before. As a result, the Zurich Policy deductible does not "represent[] the amount of the loss that the insured is responsible for before the coverage is triggered," *Cont'l Cas.*, 683 F.3d at 90, but rather the amount that the insured is responsible for *after* coverage is triggered.

Centex posits that the SIR/deductible distinction is immaterial because courts in other states have reached similar holdings with respect to policies that required a deductible. *See, e.g.*, *Gen. Star Nat'l Ins. Corp. v. World Oil Co.*, 973 F. Supp. 943 (C.D. Cal. 1997); *Fortune Ins. Co. v. McGhee*, 571 So. 2d 546 (Fla. Dist. Ct. App. 1990); *Fl. Ins. Guar. Ass'n v. Jacques*, 643 So. 2d 101 (Fla. Dist. Ct. App. 1994). However, none of these cases obligated an excess insurer to credit payments made under a primary policy toward the excess policy's

deductible; indeed, none of these cases involved any tower of insurance at all. The Court does not find these authorities persuasive.

Centex also argues that Zurich's interpretation of the policy violates anti-stacking and apportionment rules. Once again, the authorities that Centex cites are inapposite. *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389 (5th Cir. 1995), *Cargill, Inc. v. Comm. Union Ins. Co.*, 889 F.2d 174 (8th Cir. 1989), *Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*, 97 Cal. Rptr. 2d 44 (Cal. Ct. App. 2000), and *Cal. Pac. Homes, Inc. v. Scottsdale Ins. Co.*, 83 Cal. Rptr. 2d 328 (Cal. Ct. App. 1999) each require the pro rata apportionment of deductibles or SIRs among insurers when the insured's claim is for a single occurrence involving continuous or progressive damage over the policy periods. None of these cases concerned a tower of insurance like the one at issue here. Moreover, requiring Centex to pay the deductible with "new funds" would not make it any worse off than it would have been without the additional coverage of the Lexington Wrap Policy or the ISOP Wrap Policy. The Court finds that anti-stacking and apportionment rules are inapplicable in this type of situation.

The Court agrees that some of the payments made by Centex, Centex Homes, Lexington, and ISOP may reduce the amount of reimbursment due. The Zurich Policy provides that "[Centex] will reimburse [Zurich] for the deductible amounts that [Zurich] pay[s] on [Centex's] behalf." Centex App. 734. This provision, like the SIR provision at issue in *Continental Casualty*, contains no limitation on the ability of Centex or entities other

than Zurich to pay "deductible amounts" on Centex's behalf.[2] "[C]ourts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 646 (Tex. 1996). Accordingly, the Court holds that entities other than Zurich may reduce Centex's reimbursement by paying all or part of the deductible amount on Centex's – or indeed Zurich's – behalf.

However, this credit does not extend to payments that fall outside the scope of the risk that Zurich agreed to cover. "The purpose of a deductible or SIR is to have the insured share the risk that has been undertaken by the insurance company. Accordingly, if the insured makes a payment that is not encompassed by the risk undertaken by the insurer, that payment should not apply against the deductible/SIR . . . ." 3 ALLAN D. WINDT, INSURANCE CLAIMS AND DISPUTES § 11:31 (6th ed.). As explained above, the Zurich Policy's deductible represents the amount of the loss that Centex is responsible for after coverage is triggered. Here, the Zurich Policy provides excess coverage for claims exceeding Centex's $500,000 SIR with Lexington, Lexington's $5 million limit of liability, and ISOP's $5 million limit of liability. Centex asserts that Centex Homes and itself paid $582,899.09 in pre-suit repairs and defense costs and that Lexington and ISOP contributed $10,069,259 to the defense and

---

[2]Zurich contends that Centex's statement to Lexington and ISOP during settlement negotiations that Centex would be "willing to fund the $1 million deductible to trigger the Zurich excess policy," Centex App. 212, is inconsistent with this interpretation. However, Centex never specified how it intended to "fund" the deductible. Moreover, "the best evidence of what the parties agreed to is found in the [contract] itself . . . ." *Houston Lighting & Power Co. v. Int'l Broth. of Elec. Workers, Local Union No. 66*, 71 F.3d 179, 183 n. 4 (5th Cir. 1995). The Court attributes little weight to Centex's statement.

settlement of the Element Litigation. In aggregate, then, only $152,158.09 of these funds might be considered part of the risk that Zurich agreed to cover. This credit falls well below the $1 million deductible amount.

The amount of the credit must be further reduced, however, because the Zurich Policy's deductible does not apply to defense costs and attorney's fees. The Deductible Endorsement provides that "all ALAE [allocated loss adjustment expense] is reimbursed in addition to the Deductible Amount." Centex App. 734. The Deductible Endorsement defines ALAE as "an expense directly allocable to a specific claim," including "all court costs, fees and expenses," "costs of all attorneys," and "any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the Policy." *Id.* at 735. Under these provisions, then, defense costs and attorney's fees are not included in the Deductible Amount, and Centex is solely responsible for those expenses.[3]

Although Centex argued in its Response/Cross-Motion for Summary Judgment that defense costs apply towards the deductible, Centex did not cite any provision of the Zurich Policy that establishes coverage for such losses. The Court holds that the Zurich Policy unambiguously provides that defense costs and attorney's fees are inapplicable to the

---

[3]This interpretation conforms with another provision in the Deductible Endorsement, under the section entitled "Effect of Deductible(s) on Limits of Liability," that states: "[a]ll sums payable for other than 'ALAE' within the deductible amounts shall be included in determining the most we will pay . . . ." Centex App. 735. This provision essentially says that ALAE does not count against the liability limit, thereby protecting Centex against a double-charge.

deductible. Excluding defense costs and attorney's fees, then, Lexington and ISOP contributed $8,982,378 to the settlement of the Element Litigation, Centex Homes contributed $97,787.01 to the pre-suit repairs, and Centex contributed nothing. Because Zurich's excess coverage did not kick in until the $10.5 million mark, these contributions were not within the scope of the risk that Zurich agreed to cover.

In conclusion, Centex has failed to satisfy its $1 million deductible. Centex's breach of the Zurich Policy resulted in damages to Zurich in the amount of $999,827.43. Accordingly, the Court enters summary judgment in favor of Zurich.

### CONCLUSION

The Court concludes that there is no genuine dispute as to any material fact and that Zurich is entitled to judgment as a matter of law. The Court grants Zurich's motion for summary judgment and denies Centex's motion for summary judgment. The Court grants Zurich's motion for leave to file a sur-reply.

Signed March 24, 2016.

_____
David C. Godbey
United States District Judge